716 A.2d 302

Karen McCRAY

v.

STATE of Maryland.

No. 1036, Sept. Term, 1997.

Court of Special Appeals of Maryland.

Aug. 26, 1998.

600

Julia Doyle Bernhardt, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Regina Hollins Lewis, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Davis R. Ruark, State's Atty. for Wicomico County, Salisbury, on the brief), for appellee.

Argued before WENNER and SONNER, JJ., and ROSALYN · B. BELL, Judge (retired), Specially Assigned.

SONNER, Judge.

In the Circuit Court for Wicomico County, a jury convicted appellant, Karen McCray, of first degree premeditated and felony murder, robbery, attempted robbery, assault with intent to murder, misdemeanor theft, and conspiracy to commit robbery.[1] On appeal, appellant presents the following questions for our review:

 I. Did the testimony of the accomplice's minor child sufficiently corroborate the testimony of the accomplice?

---

1. The court imposed a sentence of life imprisonment for the conviction of first degree premeditated murder, but did not impose a sentence for first degree felony murder. The court imposed a consecutive ten-year sentence for the robbery conviction, and imposed a ten-year sentence for the conspiracy to commit robbery conviction. The sentence for the conspiracy conviction was to run concurrent with the sentence for the

II. Did the trial court err in admitting prior statements of the accomplice?

III. Was appellant's statement to the police voluntary?

We find that the trial court erred in admitting the accomplice's prior consistent statements and, accordingly, reverse and remand.

## FACTS

Before being suffocated to death on September 12, 1996, Lucy Lyles lived on Booth Street in Salisbury, Maryland. About a month prior to her murder, she had opened her home to Tawanna Howell and Howell's four children (ages eleven, eight, seven, and five), at the request of Ms. Howell's mother, Diane Burgess. While living with Ms. Lyles, Howell met and began to socialize with Karen McCray, who lived a short distance away.

At trial, Howell described the events of September 12, 1996 as follows: She and her four children were at McCray's home; the children were playing upstairs with McCray's son, while McCray, Howell, appellant's brother, Glen McCray, and some friends were downstairs smoking crack cocaine. While Howell was at McCray's, Diane Burgess stopped by and told Howell that she had her children's Social Security check. Howell left McCray's house to cash the check. When she returned to the McCray house, she gave McCray $20 so that McCray could purchase more crack cocaine. Howell waited for her children while McCray and the others continued to smoke. Then, at about 10:00 p.m., Howell, her four children, and McCray left the McCray house and went to the Lyles home. Before leaving, McCray inquired of Howell whether Ms. Lyles had any money and Howell told her that she probably did. McCray told Howell that they were going to go to Ms. Lyles's house "and scare her and try and get some money out of her."

---

robbery conviction, but consecutive to the sentence for the first degree murder conviction. The court merged the remaining convictions for sentencing purposes.

Howell told McCray that she did not need to hurt Ms. Lyles because, if she asked, Ms. Lyles would give her the money.

Howell and the children entered the apartment by the back door, while McCray waited outside. At McCray's request, Howell put her children in the bathroom and then returned to the back door to let McCray in. When she opened the door, Howell found that McCray had put a black net stocking over her face and that her brother, Glen, had also come over. Howell let both of them enter and Howell began to walk toward Ms. Lyles's bedroom door. McCray opened the bedroom door and flicked the light switch on and off. Ms. Lyles called out, asking, "Who is that?" No one answered, but all three entered the bedroom, and McCray jumped on top of Ms. Lyles's head, "straddling her with her legs sitting on top of her face." McCray repeatedly demanded money while Ms. Lyles said, "Oh, my God, they [sic] trying to kill me." Howell stood at Ms. Lyles's feet and McCray told her to grab them because Ms. Lyles was flailing her legs and arms. Howell grabbed the victim's feet while McCray tried to tie Ms. Lyles's hands with the cord of an iron. Ms. Lyles continued to struggle, so McCray hit her on the side of the head with the iron. Meanwhile, Glen McCray rummaged through Ms. Lyles's belongings, looking for money.

After being struck with the iron, Ms. Lyles stopped struggling and lay on the ground mumbling, "Oh, my God, why, why?" McCray then took a large pillow and put it over Ms. Lyles's face and sat on top of the pillow. After minutes passed, Ms. Lyles stopped moving completely and McCray got up and started going through the victim's belongings. McCray found Ms. Lyles's work bag with a black wallet, from which McCray removed fifty dollars. After she found the money, McCray told Howell to get her children out of the bathroom. McCray and her brother left first and then Howell brought her children out and they left Ms. Lyles's home and went to McCray's home. Howell and the children went inside and, while Glen watched the children, McCray and Howell went away and bought some beer and crack cocaine. They returned to McCray's house and smoked the crack cocaine.

At approximately 1:00 a.m., McCray, Howell, and Howell's children returned to Ms. Lyles's house. Howell straightened up Ms. Lyles's bedroom, while the children and McCray sat in the living room. Howell then returned to the living room and McCray left. The children went to sleep and, at approximately 7:00 a.m., Howell woke the children and took them to her mother's house, told her mother what had happened, and left for Pocomoke in the evening, where the police later arrested her. Howell made detailed statements, describing the killing to the police, and, subsequently, pleaded guilty to second degree murder for her involvement.

Shantanna Howell, Tawanna's twelve-year-old daughter, testified at trial. Shantanna recalled that on September 12, 1996, she, her siblings, and her mother went to McCray's home and, later that night, they walked back to Ms. Lyles's house and entered the apartment through the back door. Once inside, her mother told her and her brothers and sister to go into the bathroom and remain quiet. After they entered the bathroom, Howell closed the door. Shantanna did not see anyone else in the apartment, but, while she was in the bathroom, she heard a knock on the door and she heard Ms. Lyles ask, "who was it," but no one answered. She then heard Ms. Lyles scream and cry, while asking for help. Shantanna also heard McCray tell Ms. Lyles to "shut up," and heard "some banging and stuff moving around." After some time passed, Shantanna heard someone leave and then Howell allowed them to come out of the bathroom. Shantanna said that Howell's hair was messy, as if "she had been working." Shantanna indicated that her mother then told them to go to sleep. Early the next morning, they went to her grandmother's house, where she overheard Howell tell her mother what had happened.

## ANALYSIS

### I.

Appellant's first argument on appeal alleges that the testimony of Shantanna Howell, the accomplice's minor child, did

not sufficiently corroborate the testimony of the accomplice, Tawanna Howell. Her claim is based on two theories: first, the corroboration came from the accomplice's child and therefore cannot constitute an independent source; second, the testimony of Shantanna and her mother was so "riddled with inconsistencies" that it did not provide corroboration with some "degree of cogency," as required. See *Brown v. State*, 281 Md. 241, 244, 378 A.2d 1104 (1977). We find no merit in this claim.

 It has been firmly established that a "person accused of a crime may not be convicted on the uncorroborated testimony of an accomplice." *Turner v. State*, 294 Md. 640, 641–42, 452 A.2d 416 (1982). We have expressed two reasons for requiring corroboration. First, the accomplice who is offering the testimony "is admittedly contaminated with guilt," (citation omitted), and, second, the accomplice may have an ulterior motive for testifying, such as seeking a reduced sentence or charge. *Id.* at 642, 452 A.2d 416. We do not require the State to produce corroboration of all of the evidence. Rather, only slight corroboration is required. As former Chief Judge Murphy said for the Court of Appeals in *Brown*,

> [T]he corroborative evidence ... must relate to material facts tending either (1) to identify the accused with the perpetrators of the crime or (2) to show the participation of the accused in the crime itself.... If with some degree of cogency the corroborative evidence tends to establish either of these matters, the trier of fact may credit the accomplice's testimony even with respect to matters as to which no corroboration was adduced. *McDowell v. State*, 231 Md. 205, 189 A.2d 611 (1963). That corroboration need not extend to every detail ... is also settled by our cases.

*Brown*, 281 Md. at 244, 378 A.2d 1104. The Court in *Turner*, agreeing with the reasoning of *Brown*, added that "the evidence offered as corroboration must be independent of the accomplice's testimony." *Turner*, 294 Md. at 646, 452 A.2d 416. That is, "the proffered evidence must consist of some-

thing more substantial than the extrajudicial comments of the accomplice...." *Id.* at 647, 452 A.2d 416.

■ In this case, appellant asserts that the testimony of Shantanna cannot be considered an independent source because she is the minor child of the accomplice, with a strong interest in protecting her mother, and, as a minor child, she was under the influence and control of her mother. We find that this argument does not, in any way, detract from the fact that Shantanna's testimony was "independent of the accomplice's testimony." *Id.* at 646, 452 A.2d 416. All we require of the testimony is that it must be "something more substantial than the extrajudicial comments of the accomplice." *Id.* at 647, 452 A.2d 416. The record demonstrates that Shantanna's testimony was based on her independent recollection of the events on the night of the murder and not on statements by her mother to her grandmother. Thus, it satisfied the requirement of testimony independent of the accomplice's testimony.

■ We also find no support for appellant's claim that the testimony of Shantanna and Tawanna Howell was so inconsistent that it did not provide corroboration with any "degree of cogency." As the Court of Appeals indicated in *Brown,* the corroborative evidence proffered must, with some degree of cogency, either identify appellant as a perpetrator of the crime or show that appellant participated in the crime. 281 Md. at 244, 378 A.2d 1104. In this case, Shantanna's testimony satisfied both of these elements. She identified appellant as a perpetrator and a participant when she told the jury that, while she was in the bathroom on the night of the murder, she heard someone knock on the door, she heard Ms. Lyles screaming for help, and she recognized appellant's voice as the one telling Ms. Lyles to "shut up." Shantanna also testified that it was at this time that she also heard "some banging and stuff moving around" and that she then heard someone leave. Thus, Shantanna provided some corroboration of her mother's testimony and, even if the remainder of her testimony differed from that of her mother, no more is required for the trier of

fact to credit her testimony *in toto*, should it choose to do so. *See Turner*, 294 Md. at 642, 452 A.2d 416 (evidence establishing material facts with some degree of cogency are facts providing only slight corroboration); *Grant v. State*, 65 Md. App. 547, 552–553, n. 1, 501 A.2d 475 (1985) (citing numerous Maryland Court of Appeals and Court of Special Appeals cases supporting the proposition that only slight corroboration is required).

## II.

Appellant also argues that the court erred on two occasions by admitting prior statements made by her accomplice, Howell, once by admitting a prior consistent statement and once by allowing the admission of a prior inconsistent statement. The trial court admitted the prior consistent statement during the testimony of Howell's mother, Ms. Burgess. The State questioned Ms. Burgess about Howell's description to her of the robbery and murder. Defense counsel objected on the grounds that the answer would be hearsay. The following colloquy then took place:

THE COURT: Wouldn't this be admissible under Rule 5–802.1(c)? Maybe you better approach the bench.

(Whereupon counsel approached the bench, and the following ensued.)

THE COURT: Excuse me, not (c). 5–802.1(b), "A statement that is consistent with the declarant's testimony, if the statement is offered to rebut an express or implied charge against the declarant of fabrication, or improper influence or motive." Did you not try to bring out improper motive of the declarant and, if so, and if this is a consistent statement, I don't know if it is, but that's what is proffered to be? ... Would it not be admissible under that section?

[DEFENSE COUNSEL]: That's for the Court to decide.

THE COURT: Okay. Well, I overrule your objection.

After the court overruled defense counsel's objection, Ms. Burgess testified as to what Howell told her about the murder. Appellant argues that the court erred by allowing Ms.

Burgess's testimony under Rule 5–802.1(b), because Howell's statement was made after her motive to lie arose and because Howell admitted to fabrication when she admitted that, initially, she had deliberately omitted any reference to her children or Glen McCray.[2] We hold that the court did err in allowing Ms. Burgess to testify about Howell's prior consistent statements, and that the Court of Appeals's recent decision in *Holmes v. State*, 350 Md. 412, 712 A.2d 554 (1998), is dispositive on this issue.

In *Holmes*, the Court of Appeals determined whether a witness's prior consistent statement was admissible under Rule 5–802.1(b) to rebut a charge of fabrication, when the statement was made after a motive to fabricate arose. Judge Chasanow, writing for the Court, adopting the reasoning and holding of *Tome v. United States*, 513 U.S. 150, 152, 115 S.Ct. 696, 699, 130 L.Ed.2d 574 (1995), held that "a prior consistent statement [that] is offered pursuant to Md. Rule 5–802.1(b) for the purpose or rebutting a charge of fabrication or improper influence or motive, . . . is admissible only if it precedes the alleged fabrication, improper influence, or motive." However, the Court found that Rule 5–802.1(b) was

> not the sole basis for admitting prior consistent statements in our courts. Maryland Rule 5–616(c) is directly on point and governs the rehabilitation of a witness whose credibility has been attacked. . . . Under Md. Rule 5–616(c)(2), a prior consistent statement is admissible to rehabilitate a witness as long as the fact that the witness has made a consistent statement detracts from the impeachment. Prior consistent statements used for rehabilitation of a witness whose credibility is attacked are relevant not for their truth since they

---

**2.** The State does not address this claim. Instead, it argues that appellant abandoned her objection because defense counsel acquiesced to the court's ruling. We find that the State's claim is without merit. Our review of the discussion between counsel and the trial judge regarding the objection does not indicate to us that defense counsel abandoned the objection. Rather, he awaited the court's ruling on his objection. Were we to follow the State's reasoning, we would place an undue burden on appellant to restate continuously the objection while asking for a ruling.

are repetitions of the witness's trial testimony. They are relevant because the circumstances under which they are made rebut an attack on the witness's credibility. (Footnote omitted.)

The Court went on to hold that the State "is not required to assert the purpose for which it is seeking admission of a prior consistent statement unless asked by the court," even though a statement admissible under Md. Rule 5–802.1(b) is admissible as substantive evidence, and a prior consistent statement admissible under Md. Rule 5–616(c)(2) is for rehabilitative purposes only and not as substantive evidence.

Because *Holmes* does not require the State to articulate whether it is seeking to admit the prior consistent statement for substantive or rehabilitative purposes, it places two burdens on the defendant. First, it is incumbent on the defendant to inquire about the basis upon which the State intends to introduce the prior consistent statement. Second, the defendant must request a jury instruction limiting the use of the prior consistent statement for rehabilitative purposes only.

In *Holmes,* the Court found that Md. Rule 5–802.1(b) did not apply because the State offered the witness's prior consistent statement, not to rebut a motive to fabricate, but, rather, to rebut a prior inconsistent statement, and found the prior statement admissible under Md. Rule 5–616(c)(2). Here, although Md. Rule 5–802.1(b) does apply, under the reasoning of *Holmes,* it cannot be a basis for admitting Howell's prior consistent statements. As Judge Chasanow articulated in *Holmes,* a prior consistent statement offered pursuant to Md. Rule 5–802.1(b) "is admissible only if it precedes the alleged fabrication, improper influence, or motive." Clearly, in this case, Howell's prior consistent statement does not precede her motive to fabricate. As appellant points out, Howell's motive to fabricate

existed from the moment that [the] robbery murder, in which she was admitted[ly] involved, took place. Further, given her mother's friendship with Ms. Lyles ... Ms. Howell's motive to fabricate at the time she gave the

statement to her mother was as strong as it would ever be—she had a motive to shift blame to [appellant] both to mollify her mother and to minimize her exposure to criminal prosecution.

Accordingly, the testimony was not admissible under Md. Rule 5–802.1(b) to attack an implication of fabrication or improper influence or motive because Howell made the statements after the motive to fabricate existed.

■ Although, under *Holmes,* the State "is not required to assert the purpose for which it is seeking admission" of the statements, here, the trial judge asked the State for its basis for offering the statements and specifically asked if the basis was Md. Rule 5–802.1(b). The State told the court that it was offering the statements under that rule. As such, it does not and cannot, on appeal, claim that the statements should be admitted under Md. Rule 5–616(c).

■ The State claims that, even if these statements were improperly admitted, the error was harmless beyond a reasonable doubt because the same evidence had been placed before the jury during Howell's own testimony. Specifically, the State points out that Howell testified to the same facts that appellant now challenges, and therefore any error in allowing Ms. Burgess to testify was cumulative and not prejudicial. We disagree.

■ As appellant points out, these statements, because they are prior consistent statements, are cumulative, but that does not make them harmless because it is their consistency that is the very nature of the harm. By allowing Ms. Burgess to testify about Howell's prior consistent statements, the State impermissibly bolstered Howell's credibility. As we said in *Newman v. State,* 65 Md.App. 85, 98, 499 A.2d 492 (1985), when the State's case depends virtually exclusively on the credibility of a witness, as in this case, the bolstering of the witness's credibility by prior consistent statements cannot be

harmless error.[3] See *State v. Cox,* 298 Md. 173, 468 A.2d 319 (1983). Accordingly, we are constrained to reverse.

 Appellant also claims that the court erred by allowing the State to admit evidence of a prior inconsistent statement by Howell through Detective Wagner's testimony. At trial, during the State's case-in-chief, Howell admitted during cross-examination that she had not told the police that her children and Glen McCray were present during the murder. On redirect, Howell indicated that she had not told this to the police until later because she was scared and shocked and because she did not want to put her children "through answering questions and all that." This answer was inconsistent with Howell's pretrial statement that she did not tell the police about her children's presence because Glen McCray had threatened her and she feared for her children. The State brought this inconsistency to light during the defense's case. Appellant called Detective Wagner and asked him about the various statements given to him by Howell and when Howell had finally admitted that her children and Glen McCray were present at the murder. On cross-examination, the State asked the detective what reason Howell had given for her failure to tell the police that her children and Glen McCray were present.

Appellant concedes that the statement might have been admissible under Md. Rules 5–613, 5–616, or 5–802.1, had the State followed the proper procedure for admitting it. Because the State failed to follow the proper procedure, however, appellant argues that the statement was not admissible as a prior inconsistent statement under the applicable rules, and was not admissible under any other hearsay exception.

The State does not address appellant's claim that it failed to follow the proper procedure in introducing Howell's prior

---

**3.** The accomplice's credibility vitally affected the State's case because the only other evidence of appellant's involvement in the crimes came from Shantanna's testimony, which placed appellant at the scene as a participant and perpetrator, but which could not detail the extent of appellant's involvement.

inconsistent statements through Md. Rules 5–613, 5–616, or 5–802.1, but, instead, asserts that the testimony was properly admitted because appellant "opened the door" to such testimony by eliciting from Detective Wagner the alleged discrepancies in Howell's statements. We agree.

The "opening the door" doctrine allows a party to respond to evidence introduced by the opposing party during direct examination that was admissible evidence or inadmissible evidence that was admitted over objection. The doctrine does not permit the admission of incompetent evidence. *Conyers v. State*, 345 Md. 525, 545–46, 693 A.2d 781 (1997). In *Clark v. State*, 332 Md. 77, 87 n. 2, 629 A.2d 1239 (1993), the Court of Appeals defined incompetent evidence as evidence "that is inadmissible for reasons other than relevancy . . . . [such as] evidence that is inadmissible because of the hearsay prohibition, for lack of authentication, or because of the best evidence rule."

In this case, appellant argues that the prior inconsistent statement admitted through Detective Wagner was not admissible, not on the ground that it was irrelevant, but because it was incompetent in that the State had failed to follow the appropriate procedure for admitting it as an exception to the hearsay rule. We disagree. Although appellant claims that the detective's testimony does not meet the prerequisites of Md. Rule 5–802.1 as a hearsay exception, we find that it does. Md. Rule 5–802.1 states that a statement "previously made by a witness who testifies at the trial or hearing and who is subject to cross-examination concerning the statement [is] not excluded by the hearsay rule" if the statement "that is inconsistent with the declarant's testimony . . . was . . . (3) recorded in substantially verbatim fashion by stenographic or electronic means contemporaneously with the making of the statement."

Howell testified at trial and was subject to cross-examination and recall concerning the inconsistent statement.[4] In

---

4. During the State's case-in-chief, after admitting on cross-examination that she had not immediately told the police that her children and Glen

introducing the evidence through the detective, the State did not fail to meet the prerequisites of Md. Rule 5–802.1, because Howell had been available for cross-examination of her recorded statement. Appellant seems to suggest that the statement could have been admitted only through Howell, but she provides no authority to support that assertion. Since we find that the State followed the proper procedure for admitting the statement under Md. Rule 5–802.1, that is, that Howell testified and was subject to cross-examination regarding a prior inconsistent statement that the police had recorded, the court did not err in admitting the prior inconsistent statement.

## III.

Finally, appellant argues that a statement taken from her at the Wicomico County Sheriff's Office was not voluntary. At the pretrial hearing on appellant's motion to suppress, Detective Mark Wagner testified that, at 3:00 a.m. on September 14, 1996, appellant had been picked up for questioning and brought to the sheriff's office by Deputy Jeff Hickman and another deputy. Detective Wagner and Detective Martin A. Fisher interviewed her approximately one-and-one-half hours later, at 5:20 a.m. They advised her of her *Miranda* [5] rights by reading to her from a standard *Miranda* form, and then they allowed her to read the form on her own. Appellant did not ask any questions, nor did she request an attorney, but indicated that she understood the questions on the form and signed it. The detectives noticed that appellant wore a yellow,

McCray were present at the murder, she testified that she revealed this information to the police during her third statement, one that was taped at the Worcester County Jail. On redirect, Howell was asked to explain why she did not initially tell the police about Glen McCray's and her children's presence. At that time, defense counsel could have subjected Howell to questioning about the inconsistency between the reason she gave at trial and the reason she gave to the police in her taped statement. The defense could have also recalled Howell as a witness after the detective's testimony and questioned her about the inconsistency of her trial statement and her statement to the police.

**5.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

long-sleeved shirt, and that one sleeve had a dark-colored stain that "appeared to [them] to be possible blood." The detectives asked appellant about the stain and informed her that, at some point, they would need the shirt for testing. At that point, appellant removed the shirt and gave it to the detectives, even though they told her she could wait until they gave her something else to wear. Detective Wagner admitted that, during the interview, appellant appeared to be under the influence of alcohol, but he did not know if she was intoxicated. He noted that, prior to her questioning, appellant urinated on herself. The detective testified that appellant slurred her speech, but that she could stand up and walk and that she was oriented as to her location and understood the questions asked of her. Detective Fisher's testimony corroborated that of Detective Wagner, and he added that appellant's eyes were bloodshot and that there was a smell of alcohol on her breath, but that this was consistent with his prior contacts with appellant. Detective Fisher also testified that, although appellant paused before answering the questions posed to her, he believed that appellant understood the questions, but admitted that "there were times that her answers . . . [were] off base. . . ."

Deputy Hickman testified that, when he picked appellant up at 3:00 a.m., she appeared intoxicated, she slurred her speech, and she had trouble keeping her balance. Sharon McCray, appellant's sister, testified that she and appellant had been drinking for several hours prior to her arrest and that appellant was intoxicated at the time of her arrest. The trial court denied appellant's motion to suppress, finding that her statement was voluntary because, despite evidence suggesting that she was intoxicated, there was no evidence that appellant "did not understand what was going on, that she wasn't completely aware of everything that was going on around her." The judge believed that appellant "understood her rights and voluntarily waived them."

On appeal, appellant concedes that mere evidence of intoxication does not render statements involuntary, but contends that, in this case, the evidence of gross intoxication was

overwhelming. Appellant cites the detectives' testimony that she was under the influence of alcohol, that she slurred her speech and paused before answering the detectives' questions, that some of her answers were "off base," that she urinated on herself, and that she disrobed in front of the male detectives. She argues that these were not actions of a person with a "rational intellect and a free will such that [her] responses to interrogation [were] voluntary."

In reviewing the denial of a motion to suppress, we review only the record of the suppression hearing and view that evidence in the light most favorable to the prevailing party, in this case, the State. *Gamble v. State*, 318 Md. 120, 125, 567 A.2d 95, 98 (1989); *McMillian v. State*, 325 Md. 272, 281, 600 A.2d 430 (1992) (citations omitted); *Riddick v. State*, 319 Md. 180, 183, 571 A.2d 1239 (1990). We also accept the court's findings of the disputed facts, unless clearly erroneous, by giving due regard to that court's opportunity to assess the credibility of witnesses; we then make our own constitutional appraisal as to the effect of those facts. *Ornelas v. United States*, 517 U.S. 690, 116 S.Ct. 1657, 1662, 134 L.Ed.2d 911 (1996); *McMillian*, 325 Md. at 281–82, 600 A.2d 430; *Riddick*, 319 Md. at 183, 571 A.2d 1239.

It is well established that, in order for a statement to be admitted into evidence, the State must prove that it was voluntary. "In Maryland, a defendant's [statement] is only admissible if it is (1) voluntary under Maryland nonconstitutional law, (2) voluntary under the Due Process Clause of the Fourteenth Amendment of the United States Constitution . . ., and (3) elicited in conformance with the mandates of *Miranda*." *Hoey v. State*, 311 Md. 473, 480, 536 A.2d 622 (1988).

Here, appellant asks us to decide only whether, under Maryland nonconstitutional law, she was mentally capable of making a statement in light of her "gross intoxication." She concedes, however, that "mental impairment from drugs or alcohol does not per se render a [statement] involuntary, and that a court may admit a [statement] into evidence if it concludes that it was freely and voluntarily made despite the

■■■■

evidence of mental impairment." *Dempsey v. State,* 277 Md. 134, 151, 355 A.2d 455 (1976). It is only when defendants are so mentally impaired that they do not know or understand what they are saying that statements become involuntary. *Hoey,* 311 Md. at 481, 536 A.2d 622.

■■■ During the suppression hearing, the testimony was undisputed that appellant appeared to be under the influence of alcohol but that she understood the questions asked of her. The trial judge determined that appellant was intoxicated but that she understood "what was going on around her" and that she "understood her rights and voluntarily waived them." We hold that the testimony presented at the suppression hearing was sufficient to allow the court to conclude that appellant was mentally capable of understanding what she was saying. We therefore conclude that her intoxication, standing alone, was insufficient to make her statement involuntary.

**JUDGMENT OF THE CIRCUIT COURT FOR WICOMICO COUNTY REVERSED; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS. COSTS TO BE PAID ONE–HALF BY APPELLANT AND ONE–HALF BY WICOMICO COUNTY.**